**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**The AMERICAN BAKERY AND CONFECTIONERY WORKERS' LOCAL UNION 300, AFL–CIO, Respondent.**

No. 17256.

United States Court of Appeals Seventh Circuit.

June 25, 1969.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Nancy M. Sherman, Allen H. Sachsel, Attys., National Labor Relations Board, for petitioner.

Irving M. Friedman, Harold A. Katz, Katz & Friedman, Chicago, Ill., for respondent.

Before CASTLE, Chief Judge, MAJOR, Senior Circuit Judge, and KERNER, Circuit Judge.

MAJOR, Senior Circuit Judge.

This case is here on petition of the National Labor Relations Board for enforcement of its order of September 26, 1967, against The American Bakery and Confectionery Workers' Local Union 300, AFL–CIO (herein called the Union). The case was heard by a Trial Examiner whose findings, conclusions and recommendations were approved by the Board in its decision reported at 167 NLRB No. 76. No jurisdictional question is involved. The parties here by stipulation waived oral argument and the case was submitted on briefs.

An unfair labor practice charge of restraint and coercion under Sec. 8(b) (1) (A) and (2) of the Act was filed with the Board on September 29, 1966, by Frank Pulizzi on behalf of himself and five other members expelled from the Union, alleging that the Union attempted to cause the company to discriminate against them. The Board's complaint issued thereon.

An abbreviated statement of the facts as found by the Trial Examiner will suffice. Prior to July 18, 1966, the Union was engaged in a strike, during which some of its members crossed the picket line and reported for work. Among those were the charging parties. At a meeting of the Union's executive board on July 22, 1966, the subject of the strikebreakers was discussed, but the minutes of that meeting are confusing as to what recommendation was made. Two days later, at the Union's general membership meeting President Callahan stated that "under [the Union's] Constitu-

tion and By-Laws, they would be expelled and possibly fined."

On July 26, 1966, an official notification signed by officials of the Union was sent to the six members who crossed the picket line, advising them of the charges and notifying them of a trial to be held on August 20, 1966, before the Union's executive board. The accused members refused to attend. The report of the trial hearing prepared by Prieto, the Union secretary, contains no mention of a fine, but states, "In view of the seriousness of the charges, the Executive Board of Local 300 expelled the charged parties from membership in the A.B.C." On August 22, 1966, identical letters over Prieto's signature were sent to the six members, informing them that "it is the judgment of the Executive Board that you be, and hereby are, expelled effective as of receipt of this communication." At the same time, a letter was sent to the company, requesting that dues check-off authorizations of the six expelled members no longer be honored. Also, notices were posted by Union President Callahan in prominent places at the company plant where members of the Union's executive board were employed, advising Union members of the trial and stating that the executive board's decision "was expulsion from the Union."

On October 18, 1966, subsequent to the filing of the charge in the instant matter, the Union, by its secretary, Prieto, advised the expelled members by letter that the August 22 letter "was not complete" and that the penalty should also have included a $1,000 fine. Prieto testified at the hearing in the instant matter that he sent this letter after coming upon some notes of the August 20 trial, which stated that the motion passed by the Union's executive board called for the imposition of a $1,000 fine on each of the accused members, as well as for their expulsion. Thereupon, Prieto prepared a second report of the trial, designed to correct the alleged error in the original report. He admitted that the notes from which this second report was prepared were destroyed by him.

The factual issues are reduced to the single issue as to whether the fine was imposed by the Union before or after September 29, 1966, the date on which the charges were filed with the Board. No issue is involved as to whether a union may impose reasonable fines on its members for strikebreaking. See National Labor Relations Board v. Allis-Chalmers Mfg. Co. et al., 388 U.S. 175, 191–193, 87 S.Ct. 2001, 18 L.Ed.2d 1123.

The Union argues that there is no substantial evidence that fines were imposed because the six employees had filed a charge, but "The uncontradicted and undenied testimony of Callahan and Prieto, the only witnesses in the case, was that the Union imposed the fines along with expulsion, at the conclusion of the trial of the six members on August 20, 1966, because these members were found guilty of crossing the picket line."

We think the Board's response to this contention is logical. It reasons: "It was not until the unfair labor practice charge was filed that the Union officers discovered an 'embarrassing oversight' —the alleged failure to refer to the fine in the expulsion letters and the notices posted at the plant. As the Trial Examiner pointed out, that this alleged oversight continued for nearly two months is odd indeed, particularly considering that this was the first time President Callahan could remember the imposition of a fine, that this was one of only two trials held during the year, and that Callahan signed the posted notices which contained no mention of the fines. Moreover, with respect to the notices, it is also odd, as pointed out above, that none of the members of the Union's executive board, who were employed in the plant where the notices were posted in conspicuous places made any comment about the alleged oversight. * * * In addition, it is noteworthy that Prieto waited at least 13 days after the alleged discovery of the 'lost' notes to send the second letter * * *. His delay suggests that there was some need for consultation with others before attending to this

'clerical' matter. The second report of the trial was prepared, according to the Union, two months after the event 'from notes that had first been misplaced, then recently found, and finally destroyed'. Not only does it lack the detail of the first report, but, as the Trial Examiner concluded, its 'only purpose could be the self-serving one of proving the imposition of the fines at an earlier, not a later date.' "

■ It does not follow from the fact that there was no direct evidence contradicting the testimony of the two Union officials that the trier of the facts must accept such testimony as a verity. By reason of the circumstances shown, we cannot say that the Examiner was not justified in rejecting it. National Labor Relations Board v. Dinion Coil Co., 2 Cir., 201 F.2d 484, 487; National Labor Relations Board v. Radcliffe et al., 2 Cir., 211 F.2d 309, 315, and Bon Hennings Logging Co. v. National Labor Relations Board, 9 Cir., 308 F.2d 548, 554. In the last case the court stated:

"Much so-called 'uncontradicted' evidence is subject to conflicting inferences which may result from the evidence itself or the attendant circumstances. The duty to choose between such inferences and to assess weight and credibility is vested in the trial examiner, not the reviewing court."

We hold that the evidence supports the Board's finding that the fine was imposed after the charge was filed, and we agree with the conclusion that the motivating factor in so doing was the filing of the charge.

■ The Union's contention that the charge filed with the Board was not sufficient to support its complaint is rejected. The contention is based on the premise that the charge alleged that the Union attempted to cause the company to discriminate against the six expelled members without mentioning the illegal fine which was subsequently imposed upon them.

We need not burden this opinion with the citation or discussion of the many cases called to our attention, particularly by the Board, which have considered the issue. The case most relied upon by the Union, which is of no benefit to its contention, is the decision of this court in National Labor Relations Board v. Kohler Co., 220 F.2d 3, 7, wherein we said:

"Section 10(b) makes the filing of a complaint contingent upon the existence of a charge, and it has been consistently held that the Board cannot initiate a complaint on its own motion. N.L.R.B. v. National Licorice Co., 2 Cir., 104 F.2d 655, affirmed 309 U.S. 350, 60 S.Ct. 569, 84 L.Ed. 799. So long as the Board entered the controversy pursuant to a formal charge, it may allege whatever it finds to be a part of that controversy. But if it gets so completely outside of the situation which gave rise to the charge that it may be said to be initiating the proceeding on its own motion, then the complaint should fall as not supported by the charge."

In National Labor Relations Board v. Fant Milling Co., 360 U.S. 301, 307, 79 S.Ct. 1179, 1183, 3 L.Ed.2d 1243, the court stated:

"A charge filed with the Labor Board is not to be measured by the standards applicable to a pleading in a private lawsuit. Its purpose is merely to set in motion the machinery of an inquiry."

On the following page it stated:

"Once its jurisdiction is invoked the Board must be left free to make full inquiry under its broad investigatory power in order properly to discharge the duty of protecting public rights which Congress has imposed upon it. There can be no justification for confining such an inquiry to the precise particularizations of a charge."

The Union contends that even on the Board's theory the fines were imposed upon non-members (they having been expelled from the Union), were uncollectible and non-coercive and, therefore, were not violative of the Act. If the Union had expelled the employees and at the same time imposed fines for the rea-

son that they crossed the picket line, a different problem would be presented. The Board found, and we agree, that the fines were imposed after charges were filed with the Board, not for the reason that the employees crossed the picket line but because they had resorted to the Board's process.

█ The Union's argument that the fines imposed were not collectible in a court of law, even if accepted, is beside the point. The timing and nature of their imposition support the Board's reasoning that they were calculated to have a coercive effect. The Union's contention on this point is without merit.

Finally, the Union contends that in any event the Board's order is too broad. The Trial Examiner recommended and the Board approved an order requiring the Union to cease and desist from "(a) Imposing fines upon employees, notifying them of the imposition of fines, or otherwise disciplining them for filing unfair labor practice charges with the Board, or otherwise participating or cooperating in Board proceedings, (b) In any like or related manner restraining or coercing employees in the exercise of rights guaranteed in Section 7 of the Act."

Among the affirmative provisions of the order is the requirement that the Union reimburse the employees in question for any money paid in satisfaction of the imposed fines. The Union on brief states, " * * * the General Counsel admitted on the record that he did not contend that the Union had made any effort to collect the fines."

█ It would appear to be an idle gesture to require the Union to reimburse employees for fines never paid. If such non-payment is established as a fact, the provision requiring reimbursement should be deleted. See Roberts v. National Labor Relations Board, 121 U.S.App.D.C. 297, 350 F.2d 427, 430. Otherwise, we find no impropriety in the Board's order.

With the suggested deletion, the petition of the Board for enforcement of its order is allowed.